Our first case for argument is Lavavitch-Chabad v. Northwestern University. Mr. Lewin. May it please the court. The district judge in this case we submit erroneously granted summary judgment to the defendants on two errors. First, we submit that the district court failed to acknowledge the Supreme Court decision in the Shahr-e-Tefillah case which recognized that in fact Jewish plaintiffs have a right to proceed under section 1981 and the district judge relied exclusively on the language of section 1981, which does not mention religion. In the Shahr-e-Tefillah case and in the Companion case, the Supreme Court unanimously held that the word race in that statute applies not merely based on what is today considered race, but what was considered a racial classification in 1870. The second ground on which we submit the district court erred in granting summary judgment and we believe that the plaintiffs should be permitted to proceed with a trial in which they could prove discriminatory intent because the district judge failed to acknowledge both evidence that could prove discriminatory intent by the direct method as well as by the indirect method. The direct method, proof of discriminatory intent, focuses first on the fact that unlike other situations in which the vice president for student affairs at Northwestern University had confronted those who were alleged to have violated regulations regarding providing alcohol to students, in this case she just did not do that. What do you think the university is entitled to do with regard to the drinking problem? Well, first Judge Posner, it seems to me the university could say, if it wanted to, that alcohol would be totally prohibited. No, no, no. The problem is not total prohibition. The question is that Rabbi Klein seems to be a jolly fellow who encourages drinking, including underage kids and so on, end up in a hospital. There has to be some regulation of that, doesn't there? Well, the situation with regard to a student being hospitalized was back in 2001. He had a discussion with the university and he was following, according to the Reverend Stephen's own testimony, he was following the rules that Northwestern had established for him, which was that on certain religious occasions, on a very limited basis, he could provide alcohol, what is a Jewish phrase, to life. That was permissible. They had told that to Rabbi Klein that it was permissible. And had Dr. Telus Ervin confronted Rabbi Klein, even indicated to him that the allegation had been made, he would have responded, and I think correctly, that this is something that's been discussed with the university. It's been agreed that for purposes of religious observance, the very limited use of alcohol would be permitted. But it wasn't limited. I don't understand. Well, I think it was limited. Well, what had these kids end up in the hospital? Well, when a student ended up in the hospital, there was a discussion with Rabbi Klein, and subsequent to that, he did not engage in any activity which resulted in anything like that. You mean prior to the hospitalization, he served a greater quantity of liquor than he did afterwards? No. I don't think that there was a greater quality, but there was no agreement with the university. I said not quality. I wasn't questioning the quality. I said quantity. Well, quantity. I don't think that was necessarily any greater quantity. What happened was there was less policing, as it were, or less careful supervision prior to 2001. Supervision by whom? Well, acknowledged by Rabbi Klein. And then as of 2001, the university made clear to him what the rules were. He followed them. The latest incident was in 2005 when he had a bar mitzvah and somebody brought in a bottle of liquor, and because it was a celebratory occasion, he did not pay adequate attention. He acknowledged that. But nothing happened between 2005 and 2012, and Reverend Stevens acknowledged that in his deposition testimony, that nothing had gone wrong in that period of time. Well, what is the story? We've had an allegation that you've been providing maybe more or providing alcohol, and Rabbi Klein would have explained correctly, well, we have an agreement with the university under which, for these limited occasions, I may provide a small amount for a l'chaim to students. There was no violation. This was, as we call it in our reply brief, totally an ambush, and that, we submit, is in and of itself... Were any of these students under 21 years old? Yes, the students were under 21 years old. Isn't there a state law against that sort of thing? There's no indication that that is in itself a violation of state law, and I submit, I mean, you can't buy it, you can't sell it, but if you give it... You can give away booze to an underage student, but you can't sell it? Well, if anything... What's your difference in law? Anything that's shown in this record is that the fraternities and sororities at Northwestern apparently frequently engage in the consumption of alcoholic beverages. Use of liquor is not abhorrent to me. I come from an Irish background. Well, that may in terms of Jewish tradition, that's certainly true for, as I say, celebratory occasions and for other... I remember I always thought they had thought Manischewitz was a wine, which struck me as being odd, I thought it was ungelled jelly myself. I'm sorry, I... I said I didn't know that they were into the finer things in life like liquor until we got to this case. It's kind of a shock to my nervous system, but go ahead. Well, again... Don't we have to distinguish for purposes of Section 1981 between religious disagreements and ethnic hostility? Well, we've noted that the Block case, this court's in-bank opinion in Block v. Frischholz, dealt with an individual who was not being discriminated against simply because she was Jewish, but because she was posting a mezuzah engaged in a religious act on her door. So this indicates that contrary to what the university is arguing, 1981 is not limited to ancestral or ethnic identity as a Jew. And in our brief, we've distinguished the very few cases that the university relies on in which they say that there was such a distinction after Chariot Fillo. In fact, this court's opinion in Block holds the contrary, and I think Your Honor's opinion in the Bachmann case indicates that you said that it was not limited to observant Jews, but the indication is that certainly Jews who observe are, by reason of their observance, protected under 1981. So is your notion that the hostility here is to particular beliefs or rituals or what have you of Lubavitchers or what? Well, the complaint says, and I think the plaintiff should be entitled to prove at a trial, that the discrimination and the hostility is to Chabad and the Jewish religion. Well, how can it be to the Jewish religion? I mean, isn't the President of Northwestern Jewish? Aren't most of the people involved on both sides Jewish? Well, let me say, Judge Posner, I think that there are cases, I can't cite them off the top of my head, in which even black supervisors can be guilty of discrimination on the basis of race against black employees. Well, that's true, but the directions from the university here were, remove Rabbi Klein and your organization can continue with its affiliation and so on. It was directed at Rabbi Klein and his behavior, not the organization's existence or participation. That's what Rabbi Klein was for many years and has built up this organization. It's like saying the Seventh Circuit would be the same if Judge Posner is removed from it. Remove Judge Posner, but we'll keep the Seventh Circuit. That's obviously untrue, but go ahead. That which is obvious is better left unsaid. Go ahead. I'm sorry, I'm not hearing you, Your Honor. I said that which is obvious is better left unsaid, so go ahead. Pick something else. Go ahead. My point is that it seems like the interest of the university was focused on Rabbi Klein and his behavior, not the overall existence or activities of Shabbat. I have to differ with that because I think if you take the key person who has built up this house, Tannenbaum House, and you say, okay, you can remove him and put in some young fellow who has had no experience and who is not known and who has not built it up, then we're not discriminating. Of course, they're discriminating by removing the central figure who has made this an important campus entity. Mr. Owen, I don't want to argue, but you're eating into your rebuttal time. Let me just ask you a quick question. What exactly would be the harm to Chabad and Klein just from the disaffiliation? Chabad is still right next to the university and he's very popular, so he'll still get the kids coming to drink with him, right? We have not enumerated those harms in our brief, but I anticipated that Your Honor might ask a question of that kind. The question of co-sponsoring events and programs at the university, getting the associate student government to recognize religious groups which open up huge funding. The university publicized the ministry of Chabad with a web, with maps, with internal search engines. It had a university email address. Chabad received incoming Jewish student lists. That's very important in terms of contacting the students as they come in. They could reserve or rent at student group discounts rooms, halls, dining rooms, etc. Rabbi Klein could be a faculty fellow. The university sends a list of all its Jewish students? Yes. In other words, Jewish groups. That's common, I think, in universities. If students indicate that they're Jewish, then the Jewish student organizations get those lists so they can contact the students. Did they do that for the Irish, too? Well, they might have struck on something here, but it requires further exploration, I think. Okay, well, thank you, Mr. Mullen, so you can have the rest of your time. So, Ms. Harjani. May it please the Court. My name is Priya Harjani, and I represent the defendants in this matter. The record is clear that Northwestern's decision to disaffiliate with the Tannenbaum Chabad House was based on the fact that an adult clergy member was responsible for serving underage students with excessive amounts of alcohol. The District Court properly granted summary judgment for two distinct reasons. First, plaintiffs' claims of religious discrimination are not recognized under Section 1981. And second, plaintiffs cannot demonstrate under either the direct or indirect method that defendants had any intent to discriminate in this matter. Turning first to the first issue of 1981. The District Court's decision that Section 1981 did not apply to religious discrimination against plaintiffs who practiced Chabad Hasidicism is correct. Section 1981 protects against discrimination based on race. The Shari Tofila case does allow Jewish plaintiffs to constitute a race. That's clear. It's undisputed. We are not saying Jewish plaintiffs can't proceed under a race claim in 1981. But that's not what we have here. Race can be defined through ancestry or ethnic characteristics, but you have to allege it as so, and facts have to come out in discovery to show it's a claim based on ancestry. The Seventh Circuit has recognized this distinction between claims of religious discrimination against Jewish plaintiffs and one of racial. In the Bachman case mentioned by plaintiffs' counsel, there's an explanation from this court stating there are two types of antisemitism. Religious antisemitism is the attitude of the medieval Roman Catholic Church, who objected to Jews because of their religion, is what this court wrote. And racial antisemitism was typified by Hitler, who objected to Jews because they're descended from Jews. So it's clear there's two separate ways Jewish plaintiffs could proceed. Now, the Block case that plaintiffs' counsel also mentioned absolutely is not on point on this issue. That's a case of intentional discrimination. That case does not discuss, the Seventh Circuit opinion does not discuss the religious versus racial issue at all. In fact, it's only mentioned in one footnote, footnote five to be specific, where it cites to the Supreme Court case of Shaare Tefila, and states that Jews can sue for race discrimination, but only when there's sufficient facts that it's been alleged properly. That case also included other statutes, such as the Fair Housing Act, that allow for religious discrimination. So presumably that complaint pled both race and religion. But that's not the case here. The case, if you look at our complaint, the plaintiffs have filed, only speak of religious discrimination. There's no message of ancestry, ethnicity, nothing. Numerous paragraphs in the complaint talk about being discriminated because of being a Chabad citizen, because of Jewish faith, because of religious discrimination. In fact, paragraph 30 states this case is, quote, solely on the basis of their religion. There's no hint of anything else in the complaint. And the same bore out in discovery. When we deposed Rabbi Klein and asked him the basis for this case, he couldn't articulate a single basis that was tied to ethnic or racial discrimination. It was all about religious discrimination. But at the summary judgment stage, didn't Chabad argue racial discrimination? There's nothing in the record on racial discrimination. This point of religion versus racial discrimination didn't come up in the briefing. It's only come up now on appeal. And even throughout the case in discovery, Chabad was comparing itself to other Jewish organizations, saying they're being treated differently than other Jewish organizations, which clearly has not been an ancestry type of claim. It's a religious claim. Turning now to the second issue, the district court's opinion should be upheld because plaintiffs did not establish a record of intentional discrimination in this matter. They failed to do so both under the direct and indirect method. There's a few key undisputed facts worth mentioning here. It is clear in the record that Rabbi Klein was routinely serving alcohol to underage students at the Tananbaum Chabad house. He admitted this. There's no issue. He was not carding students in his weekly Friday night Chabad dinners, where both wine and hard alcohol was readily available. He offered brown or white shots in his own testimony, indicating whether they wanted shots of vodka or whiskey. And at least two students we know of have been hospitalized. There was a suggestion somewhere that it would violate some religious tenet if they carried ID. That's what Rabbi Klein contended, yes, in his deposition, that he could not card students on Friday nights due to the Chabad tradition. Could they carry fake ID without committing a religious violation? I think his point was that he couldn't ask them to check or they couldn't carry it. Therefore, he did not request to see any identification. However, as is clear in his affidavit, alcohol did not have to be served. Grape juice could have been served for a religious tradition, but hard alcohol and wine were both being served weekly. Did RFRA ever come up in this case? Excuse me, did what? RFRA, you know, the Religious Freedom Restoration Act. It came up very early, but it was not explored very far in discovery. After learning of the most recent events, the university conducted an investigation that included interviewing at least nine people and reviewing much documentation both about the current state of affairs and going back. I'm curious, why was the investigation done by the vice president instead of the chaplain? The assertion is that this was an affiliation issue, not a conduct issue. Correct, and the vice president doesn't do conduct issues either. How the investigation began was information was given to Reverend Stevens that there was an issue at the Chabad house. He took it to his supervisor, who's the vice president, and she felt so concerned about the issue she decided to do the investigation. That was out of the ordinary for the vice president to do it, wasn't it? Well, what our policy simply says is that the decision to affiliate or disaffiliate is up to the chaplain. And in this case, the chaplain and the vice president made the decision together. Nothing in the policy says who's going to do the investigation one way or the other. But once the vice president did conduct the investigation, her and the reverend jointly decided we should proceed with disaffiliation. But prior to proceeding with disaffiliation, they gave Rabbi Klein the chance to step down because it was really his conduct that was worrisome, not the Chabad house generally. And had he stepped down, Chabad today would still be affiliated with the university. Since he did not step down, the university proceeded to disaffiliate with the Tannenbaum Chabad house. Judge Bauer asked a question that I realize I didn't understand. I mean, I don't know what the answer is. Liquor can't be sold to the under 21 kids, but can it be given to them? No. Under Illinois law, alcohol is not to be consumed by anyone under 21. As a matter of fact, if you threw a party and served alcohol to 100 minors, you're violating the law very severely. Yeah, there have been a lot of cases. Is there any violation? Is there any prosecution? To be fair, there is a religious exception under Illinois law. Now, this has not come up as record evidence in the case. There's always been that. Yeah, but you can go to church, get your sip of wine. There is a religious exception. It doesn't go into a lot of detail about how much alcohol can or should be served. And in this matter, we feel what was being served was excessive to the point students were going to the hospital. Now, what about the notion, I've never heard of this before, but that for Purim, a Jewish holiday, people are actually supposed to get drunk. There are various interpretations of what you're supposed to do. What was clear from record testimony is that Rabbi Klein stated himself, alcohol does not have to be part of the celebration. You can use grape juice. And, in fact, according to his testimony, now the Chabad house is dry. It must be hard to get drunk on grape juice. I would guess so, Your Honor. If you really work hard, you can get drunk on almost anything. By their own admission, the Chabad house is functionally dry these days. So clearly they can proceed with their religious ceremonies without serving underage students alcohol. All of the university's actions were conducted in accordance with the religious affiliation policy, which states affiliation is a privilege, and the university may withdraw it whenever it would be in the best interest of the university community. And that's what happened here. At this point, we felt Rabbi Klein was not in the best interest of the community. However, since he did not step down, the university continued to disaffiliate. Under the direct method of intentional discrimination, plaintiffs have actually waived their ability to raise that on appeal. They did not raise this in the lower court, and the lower court found there was no evidence of direct testimony. Under the indirect method, the plaintiffs have not established a prima facie case, and the relevant element there is whether they were treated less favorably than a similarly situated group. The problem here is plaintiffs have compared themselves to the wrong groups. They're trying to compare themselves to student groups that are very different from religious affiliates. Student groups on campus have no adult leaders. Student groups cannot actually be disaffiliated because they were never affiliated to begin with. They're comparing themselves to sororities and fraternities. These are actually groups that belong to the university as opposed to religious centers such as Chabad was that are actually invited guests into the university community. Are there any other religious groups in the university? There are. There are currently five more religious centers that are affiliated. Is there a Cardinal Newman Club? I don't believe so. The current five religious centers are the University Christian Ministry, the University Lutheran Church, Sheol Catholic Center, Canterbury Episcopal Center, and Halal Center, which is another Jewish group. So those are the groups the plaintiffs should have been comparing themselves to. Are there any criteria for affiliation? Now, for example, one of the leading religious groups in Judge Tender's state is the Church of Satan. Now, if the Church of Satan wanted to reside over by the high priestess of Satan, and if they wanted to establish or if they bought a little building next to the church, would they be eligible for affiliation, or are there some kind of religious criteria? There is a policy, Your Honor, which is included in a defendant's appendix, page one, that states the criteria. I don't have them all at the top of my head, but there are criteria. You have to make a statement to the chaplain. The chaplain has to recognize the religious purpose, and then there is a process by which you then become affiliated. It's within the university's discretion, however, so I would assume if they didn't think— There's nothing in the record to say they have turned anybody down. The last reason student organizations are not the proper comparables is the consequences are different to them. If they are removed from campus, such as a fraternity which has been removed for drinking in the past, they are gone forever and they cease to exist. The Tannenbaum-Habad House, however, is independent. It's operating, and the university has no method to stop that. Does the university own the fraternity and sorority houses and properties? I believe they do, Your Honor. There's no record testimony of that, but, yeah, they are on our land, and there's leases back to us. Habad owns its own property or leases its own property. Correct. They either own or lease it. It's not university property on which the Habad House sits. Finally, if plaintiffs had established a prima facie case in this matter of discrimination, there's absolutely no evidence the university's decision was pretext for discrimination. The university offered legitimate, nondiscriminatory reasons of underage drinking with an adult religious leader, and plaintiffs would now need to show the reason as a lie or lax factual basis, and they presented no evidence to show these reasons were not genuine. If there are no other questions, the defendants respectfully request you affirm the decision of the district court. Okay. Thanks, Ms. Sargent. So, Mr. Lewin, do you have anything? Just to address a few points in the time that I have, Judge Bower asked about the question of why this was being considered by the vice president for student affairs. Indeed, if you look at the ñ it's in small type, page 35 of the separate appendix, the president of Northwestern University himself, when he got a call from Rabbi Klein, said, I could either tell him that this matter is between the student affairs office and him, and that I have total confidence in Patricia and see no reason to meet with him. The president obviously thought this was not under the religious affiliation rules and not subject to what Reverend Stevens would decide, but would be decided by the office of student affairs. So the whole notion that this is in some way to be governed by the religious affiliation policy is, we think, an after-the-fact rationalization. Now, with regard to the question of whether religious discrimination includes practice, we've quoted at page 16 of our reply brief the case which the university just waves away and says is wrong, and that's LeBlanc-Sternberg v. Fletcher, where the judge said, because Jewish culture, ancestry, and ethnic identity are intricately bound up with Judaic religious beliefs, racial and religious discrimination against Jews cannot be as easily distinguished as defendants would have it, and he cites your Honor's decision in the Bachman case. What the university relies on in its brief is testimony from the deposition of Rabbi Klein. Now, that was not what Dr. Telus Irvin had. She did not have that testimony as to what happened, but she talked apparently to some people, but we don't know, and I don't think the court can simply say, look, she relied on everything that later on in the course of litigation Rabbi Klein acknowledged. And finally, what the university could have done was it could have said, we don't want alcohol served at all. Rabbi Klein would have agreed with that. He would have eliminated it. He would have started a student revolution. Would there be a student revolution, you said? Well, Rabbi Klein would have had he been confronted, but the gross unfairness of all this is that without even saying anything to him, without even suggesting to him that there was a way of taking care of this problem, he was essentially discharged. And therefore, we think that is sufficient evidence, along with all the others that we talk about in the brief, to entitle the plaintiff to a jury trial and to let a jury decide whether Dr. Telus Irvin was motivated by the kind of discriminatory animus. Did Rabbi Klein propose to the university that he would ban liquor? Pardon? I'm sorry. Did Rabbi Klein propose to the university administration that he would ban liquor? He was never asked about that. No, he said he wasn't asked, but did he? My understanding is that if he had been asked to do that, he would have agreed to do that. But in the meantime, he was working within the regulations that had been resolved by the predecessor to Dr. Telus Irvin. And to say to him, well, now, Rabbi, you follow the rules, you follow them for seven years, there's been no problem, but you're out. We submit that's only, and the jury can decide that that is because there was discrimination against him because he was a rabbi and because it was the Chabad house. Okay, well, thank you very much, Mr. Lewin and Ms. Hajani. And we'll move to our next case.